The UNITED STATES of America

v.

D.K.G. APPALOOSAS, INC., et al.

Nos. S–84–43–CA, S–84–44–CA,
S–84–45–CA, S–84–147–CA,
and S–84–149–CA.

United States District Court,
E.D. of Texas,
Sherman Division.

Feb. 21, 1986.

Bob Wortham, U.S. Atty., Wes Rivers, Asst. U.S. Atty., Beaumont, Tex., Bert Garcia, Asst. U.S. Atty., Sherman, Tex., Steve Mason, Asst. U.S. Atty., Tyler, Tex., for the U.S.

Gerald Goldstein, Goldstein, Goldstein & Hilley, San Antonio, Tex., Joseph C. Hawthorn, Beaumont, Tex., Joe Brent Johnson, Fort Worth, Tex., Charles B. Robinson, Sherman, Tex., for claimants, Bruce Emery Griffin, NABUC, Ltd., D.K.G. Appaloosas, Inc., Antonio Griffin and Joseph Edge.

John J. Cunningham, Jr., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for claimant, Dr. Leffie Carlton, Jr.

## MEMORANDUM OPINION AND ORDER

STEGER, District Judge.

The following motions are presently awaiting resolution in this consolidated action:

(1) Claimant Dr. Leffie M. Carlton, Jr.'s Motion for Summary Judgment and for Declaration that Claimant is not Responsible for Bills.

(2) Plaintiff United States of America's Motion to Alter or Amend the Judgment.

(3) Plaintiff's Motion to Set Aside Judgment and for Judgment Non Obstante Verdicto, or in the Alternative, Motion for New Trial.

(4) Claimants' Motion to Reconsider Order Staying Enforcement of Judgment.

(5) A Joint Motion to Release Household Furnishings.

The following opinion is composed of four parts. The first provides a review of the procedural events which preceded these motions. (P. 2) The second explains the Court's decision to grant Dr. Carlton's motion for summary judgment but deny the plaintiff's motions to alter, amend or set aside the judgment and the plaintiff's alternative motion for new trial. (P. 16) The third section provides the reasoning behind the Court's decision to tax a portion of the maintenance expenses incurred by the government against the prevailing claimants. (P. 60) Finally, the fourth part lifts the stay and reinforces the judgment entered on December 9, 1985. (P. 83)

## I. PROCEDURAL BACKGROUND

As an experiment with a new apparatus for the seizure of proceeds from drug transactions, the attempted forfeiture of the D.K.G. Ranch has been a procedural nightmare. Dozens of motions and proceedings in two federal district courts have led to hesitancy, delay, and disorder. The lack of statutory or judicial guidance caused by the paucity of similar cases has led to many of the difficulties encountered. One thing has become clear, however: But for a pre-plea agreement finalized in September of 1983 between the United States and Bruce Emery Griffin, the D.K.G. Ranch could have been sold long ago.

That agreement has become the focal point in this case. By its terms, the government agreed not to impose any further civil sanctions on Bruce Emery Griffin for conduct known to the United States Attorney and committed in the Southern District of Florida prior to the date of the agreement. According to Griffin's interpretation, forfeiture of property he owns would be a civil sanction against him, and is proscribed by the plea agreement as long as the property was purchased with pro-

ceeds from illegal conduct occurring in the Southern District of Florida. He has admitted purchasing the property with such illegal proceeds, and has asserted his interpretation of the pre-plea agreement as his primary defense to this forfeiture proceeding.

This proceeding differs from all others. Unlike so many of the reported forfeiture cases, mostly involving boats or automobiles, this case has involved the seizure of an operational, multi-million dollar Appaloosa horse ranch and several million dollars worth of gold and jewelry found on the premises. More than the difference in the value of the seized property, what separates this case from so many others is the fact that the government has continued to operate the ranch, spending to date over two million dollars in the process.

Yet under revamped and broadened procedures for the forfeiture of traceable proceeds from drug trafficking, the operation of seized businesses is becoming less unique. There may be other cases, now or in the future, where the government will spend millions in upkeep while forfeiture proceedings progress through the courts. It is unlikely, however, that there will be many of these large forfeiture cases in which the claimants will stipulate that the government had probable cause to seize their property, admit that drug money was used to purchase the property, and assert only one defense: The government promised not to do this.

No such promise was mentioned when the government approached this Court on the evening of March 13, 1984, seeking authority to seize the D.K.G. Ranch. This Court was not told about the existence of the pre-plea agreement made between the government and Bruce Emery Griffin until six weeks after the seizure. By then, the United States Marshal's Service had firm control over all the assets, and a substitute custodian had been appointed who was operating the ranch. The government was committed, and it was too late to turn back without great difficulty. If this Court could have foreseen the delays that ulti-

mately attended these proceedings, the difficulty might not have seemed so great.

By the same token, if this Court had known about the plea agreement on March 13, 1984, it is unlikely that it would have given the government authority to seize the ranch without a thorough inquiry into the provisions of the bargain. Such an inquiry may have led to a refusal to give the authority to seize, or it may have led to a limited seizure upon strict conditions. This observation is conjectural, and is made with the benefit of hindsight. The fact remains, however, that all relevant information should have been presented to the Court, and it was not.

█ The information that was presented to the Court clearly warranted authorization of the seizure. The government stressed the fact that the property had been purchased with the proceeds from illegal drug trafficking by a major narcotics dealer in Florida. They assured the Court that they had conclusive evidence to establish all necessary requirements for a forfeiture, and described some of that evidence. Due process did not require that pre-seizure notice or opportunity to be heard be given to the owners of the seized property. *See United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 450 n. 5 (9th Cir.1983) (and cases cited therein). Under these circumstances, it seemed appropriate to go forward with the forfeiture proceedings.

As a result, the D.K.G. Ranch was seized on March 14, 1984. The various claims to the property were filed on March 26, 1984. The next month consisted primarily of a dispute concerning the extent of the powers to be granted to the substitute custodian appointed to operate the ranch. This dispute was resolved by an agreement memorialized in a written order dated May 10, 1984. This order amended an earlier order spelling out the powers of the custodian. The amended order gave the claimants the right to monitor the ranch operations on a weekly basis at an agreed time and through an agreed agent. This understanding was reached after a hearing conducted by this Court on April 23, 1984.

One week earlier, on April 16, 1984, Bruce Emery Griffin's attorneys in Florida had brought the seizure of the D.K.G. Ranch to the attention of the Hon. William M. Hoeveler, the federal district court judge who had accepted Griffin's plea bargain. Griffin's attorneys made clear their belief that the seizure action in Texas was in violation of that September, 1983 pre-plea agreement. Nothing substantive came of this hearing. It is mentioned because it was only after this hearing that this Court was apprised of the existence of the pre-plea agreement.

Knowledge of the pre-plea agreement came from one of the attorneys for Bruce Emery Griffin, who informed the Court in chambers just before the April 23, 1984 hearing began. The government was quick to point out that the seized land was deeded to NABUC, Ltd. a Bahamian corporation. In addition, most of the other seized assets were apparently owned by D.K.G. Appaloosas, Inc., a Texas corporation wholly owned by NABUC, Ltd. Neither of these corporations were parties to the pre-plea agreement, and as a result the government contended that the agreement did not bar forfeiture of the seized property. In addition, the government argued that the plea agreement should be set aside or interpreted so as to allow this forfeiture.

The next several months were composed of attempts by both sides to engage in discovery and by delays caused by the claimants. After abiding by a protective order requiring compliance with government regulations, the claimants were successful in obtaining the information they requested from the government. When they were summoned for depositions, however, the claimants asserted fifth amendment privileges and refused to testify. Requests for admission and document requests from the government were ignored by the claimants. Through it all, the claimants were constantly seeking additional time in which to file their answers. From April 9, 1984 until August 10, 1984, this Court honored seven requests for additional time. The final deadline for filing an answer was August 20, 1984, more than five months after the seizure.

On August 20, 1984, the claimants and the defendant property finally filed answers, together with a motion for more definite statement and, more importantly, a motion for change of venue to Florida. This latter motion represented the first time that the pre-plea agreement issue had been formally raised in written pleadings filed in this Court. Three days earlier, on August 17, 1984, Bruce Emery Griffin's attorneys in Florida had filed an "*In camera* Motion for Specific Performance of Pre-Plea Agreement" which sought a declaration from Judge Hoeveler that the bargain precluded the forfeiture of the D.K.G. Ranch.

At this point it became apparent that the pre-plea agreement was the key to resolving this matter. The agreement presented two very different questions. First, the agreement required interpretation, since it was unclear whether it precluded or excluded the attempted forfeiture in Texas. Second, it was unclear whether two corporations who were not parties to the agreement actually owned the property. In a response filed in Texas in September of 1984, the government opposed any change of venue on the sole ground that since the property sought to be forfeited was located in Texas, Texas was the proper forum for deciding both of the issues concerning the pre-plea agreement. Conversely, the government argued that the court in Florida lacked jurisdiction over the property, and therefore it could not interpret the plea agreement it had previously approved.

While there was little doubt about this Court's jurisdiction over property located in Texas, going beyond this to interfere in criminal proceedings in another district raised serious questions. This Court knew nothing about Bruce Emery Griffin or the extent of his criminal involvement. In all likelihood, however, this information would have been contained in a pre-sentence investigation report prepared for Judge Hoeveler. This Court knew nothing about the negotiations that led up to the pre-plea

agreement, nor was it acquainted with the attorneys involved or standard plea negotiation practices in the United States Attorney's office in Florida. It knew nothing about other criminal proceedings against Bruce Emery Griffin in Florida. It was unaware of any Florida property owned by Bruce Emery Griffin that was forfeited as a part of the agreement. This Court could not appreciate the value of information given by Griffin as a part of his bargain, nor did it know the extent of the tax liability that was omitted from the proscriptions of the agreement.

In short, this Court knew nothing about the conduct leading up to the forfeiture proceedings in Texas, and Judge Hoeveler did. It would have required numerous hours for this Court to gain the same familiarity that another judge already had. This would have constituted an unnecessary expenditure of judicial resources.

 In addition to this practical consideration, there is case authority supporting the proposition that good faith disputes concerning the interpretation of a plea agreement should be made by the judge that accepted the plea. *See, e.g., United States v. Strawser,* 739 F.2d 1226, 1230 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984). When a plea agreement is breached, that same judge should be the one to order specific performance or dismiss the indictment, whichever is the appropriate remedy. This is true even if the agreement is breached in another district. *See, e.g., United States v. Carter,* 454 F.2d 426, 428 (4th Cir.1972), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974). It was up to Judge Hoeveler to decide whether this pre-plea agreement was to be set aside, interpreted to allow forfeiture, or interpreted to bar forfeiture. Both logic and law dictated that the judge who accepted the plea bargain also should interpret it, while this Court worried about matters like the expenditure of funds for upkeep, discovery disputes, interlocutory sales, determination of ownership, taxation of costs, and all the

other issues that were related to the property in Texas.

Beginning in September of 1984, this Court hoped for a quick decision from Florida interpreting the plea agreement since so many other issues seemed to hinge on that one. In the meantime, work proceeded on the rest of the docket. In November, the Court authorized the release of mares owned by Dr. Leffie Carlton that had been on the D.K.G. Ranch for breeding purposes. On December 13, 1984, the government filed a motion for partial summary judgment on issues related to the plea agreement. This was the first time that the government had affirmatively sought any action from this Court on that issue.

Concerned by the lack of any real progress, the Court held a pre-trial conference on December 17, 1984. The parties informed the Court that a hearing was in progress in Florida on the motion to specifically enforce the plea agreement, and that Judge Hoeveler wanted briefs by January 7, 1985. The intention of this Court was to resolve any matters pending in Texas that precluded a trial and then proceed to trial without waiting on a decision concerning the plea agreement. Pursuant to that goal, this matter was set for trial on January 21, 1985. It was subsequently moved to February 4, 1985 to accommodate the presence of a jury panel.

On January 16, 1985, the government filed a motion for continuance, arguing that the pre-plea agreement had to be interpreted before a trial could proceed. The claimants subsequently concurred, and asked the Court to delay the matter until after the court in Florida ruled on the matters pending there. The Court reluctantly agreed, and continued the matter until a date twenty-one days after the parties received a dispositive ruling from the court in Florida.

The next two months saw the filing of additional pleadings and the renewal of a request by the government to conduct a partial interlocutory sale of some of the horses. No ruling came from Florida. Concerned by the continued delay, the

Court held a case status conference on April 10, 1985. Counsel for both sides informed the Court of the status of the motion for specific enforcement of the pre-plea agreement pending in Florida. The need to reduce the size of the herd of horses on the ranch was also discussed, and the government stressed the necessity of having a sale. The parties were urged to reach some agreement on the matter.

No agreement was possible, and the Court held a full day hearing on April 24, 1985 on the issue of ordering a partial interlocutory sale. After listening to testimony and argument, the Court ordered such a sale, to be scheduled as soon as possible. The sale was ultimately performed in August of 1985.

The remainder of the summer of 1985 was spent waiting on a ruling from Florida. In the meantime, the parties began filing additional pleadings and motions. Spurred by rumors of a possible settlement, on July 17, 1985 the Court contacted the Assistant United States Attorney handling the case in Beaumont, Texas. Counsel informed the Court that no settlement had been reached, and updated the Court on the progress in Florida, noting that Judge Hoeveler apparently was having difficulty scheduling time for hearings on the matter due to his heavy criminal caseload. On July 22, 1985, the Court contacted Judge Hoeveler to obtain some estimate of the time he would need to make a ruling. Judge Hoeveler agreed that he was the one who should make the determination concerning the meaning of the plea agreement, and that such a determination was necessary before a trial in Texas. He expressed optimism that a ruling could be forthcoming in the near future.

On August 16, 1985, Judge Hoeveler convened a hearing to announce a provisional ruling. He indicated that he would specifically enforce the plea agreement. Any property owned by Bruce Emery Griffin and known to the United States Attorney at the time of the pre-plea agreement was protected from forfeiture. He expressed uncertainty about the ownership of the seized property, and indicated that these questions required resolution in Texas. He also expressed some uncertainty about the status of the gold and jewelry found on the premises of the D.K.G. Ranch when it was seized.

Perplexed by the provisional status of the ruling, this Court waited in the hopes of receiving a final written order. On August 19, 1985, the Assistant United States Attorney in Beaumont had indicated that a written order was expected from Florida in two to three weeks. On September 9, 1985, the Court contacted Judge Hoeveler to see if a written order had been entered. He indicated that an order would be forthcoming shortly.

Regardless of the fact that no written order had yet been entered in Florida, it was clear that a trial in Texas was necessary to determine whether the corporations or Bruce Emery Griffin owned the seized property. A finding that the corporations owned the property would allow the government to sidestep the pre-plea agreement in spite of Judge Hoeveler's decision to enforce it. In an effort to clear the stage for this trial, the Court proceeded to consider all motions then pending in Texas.

On September 23, 1985, the Court issued an order ruling on those pending motions, and setting the matter for trial to decide the ownership issues left unresolved. The Court expressed its understanding of Judge Hoeveler's provisional ruling in the hope that he would clarify any misunderstanding before the trial began. The Court referred to the original order of continuance providing for a trial setting twenty-one days after a ruling from Florida, then set the case for trial on November 4, 1985.

In the weeks that preceded the trial, the Court was required to hold two in chambers hearings to rule on motions and resolve obstacles standing in the way of the trial in Texas. The first hearing was on October 11, 1985, and the second was on October 28, 1985. In all, over a dozen motions were filed and eight orders were entered, many concerning continuing discovery disputes. Through it all, the Court

hoped for a final written order from Florida. The Court tried to reach Judge Hoeveler again on October 28, 1985, but was informed that he was at a conference until November 4 or 5, 1985.

On November 4, 1985, the trial began in Sherman, Texas. The jury was charged at 11:00 a.m. on November 7, 1985, and retired to consider the question of ownership of the seized property. Earlier that morning, the Court had received a call from Judge Hoeveler in Florida inquiring about the contents of the jury charge and suggesting that his final written order would be issued that day. The jury returned its verdict just after 4:00 p.m. on the same day, finding that Bruce Emery Griffin and Donna Krauss Griffin, his wife, owned all of the seized property. Based on Judge Hoeveler's provisional ruling in August, this verdict meant that Bruce Emery Griffin would be entitled to reclaim the seized property.

No final written order had been issued in Florida, however. Until this was done, there was a possibility that Judge Hoeveler would alter his interpretation of the pre-plea agreement. For that reason, this Court hesitated in issuing a final judgment based on the jury's verdict. The Court contacted personnel in Judge Hoeveler's office twice after the trial, the second time on December 2, 1985. At that time it was indicated that a written order would be issued by the end of the week.

On December 5, 1985, the Court received word that such an order had been signed. The pre-plea agreement would be upheld. Any property that was owned by Bruce Emery Griffin and known to the United States Attorney at the time of the plea bargain was protected from forfeiture. The order made clear that the United States Attorney knew about the ranch at the time of the agreement, but parenthetically described the ranch as "the real estate." The order noted the existence of remaining questions concerning whether the United States Attorney knew about the gold and jewelry found on the ranch premises at the time of the seizure.

Based on the written order from Florida, dated on December 6, 1985, this Court went forward with the entry of judgment. On December 9, 1985, the Court issued an order resolving some pending matters, and then entered judgment in all but one of the six separate actions that together comprised the D.K.G. Ranch forfeiture. The sixth action was against the gold, jewelry and cars seized on the premises. Judgment was not entered in that action due to the unresolved questions concerning government knowledge at the time of the pre-plea agreement.

Since entry of judgment, the United States Marshal for the Eastern District of Texas has received notice of the filing of a tax lien against the D.K.G. Ranch. The Internal Revenue Service's claims for unpaid taxes were specifically omitted from the pre-plea agreement made between Griffin and the government. Although the exact amount of the lien is unknown to this Court, it is reportedly in the neighborhood of six million dollars.

In spite of all the delays, and except for the separate action concerning the cars, gold and jewelry, this Court is now preparing to take its final actions in these proceedings. To that end, the following motions require resolution.

## II. PENDING MOTIONS

### A. Dr. Leffie Carlton's Motion for Summary Judgment

After careful consideration, the Court is of the opinion that the Motion for Summary Judgment of Claimant, Dr. Leffie M. Carlton, Jr., To Release Foals and for Declaration that Claimant is not Responsible for Bills should be GRANTED.

In November of 1982, Dr. Carlton made an agreement with Bruce Emery Griffin whereby Dr. Carlton brought thirteen mares to the D.K.G. Ranch to be bred with Roman's Straw Man, the star Appaloosa stud at the ranch. These mares were still on the premises when the ranch was seized in March of 1984. Bruce Emery Griffin had no ownership interest in these horses,

and the government ultimately agreed that there was no basis upon which those mares could be forfeited. They were returned to Dr. Carlton pursuant to a court order dated November 21, 1984.

A dispute remains concerning fees and the expenses the government incurred caring for Dr. Carlton's mares before they were released, and the expenses the government continued to incur caring for the foals born to those mares. Dr. Carlton's motion for a separate trial to resolve this dispute was granted by an order dated October 30, 1985, leaving it for resolution at this time. Both the government and Dr. Carlton concur that Dr. Carlton's agreement with Bruce Griffin called for the two of them to split the foals born to Carlton's mares. Six such foals remain on the D.K.G. Ranch, and ten of the thirteen mares were in foal at the time they were returned to Dr. Carlton. Apparently, however, only five good foals were born to those ten mares.

The dispute concerning expenses can be broken down into two parts. First, there is a dispute concerning Dr. Carlton's responsibility for the stud fees for the mares. He maintains that his only payment was to be half the foals, and therefore he is not liable for any stud fees. The government, on the other hand, argues that Dr. Carlton agreed to pay one-half of the usual stud fees. Second, there is a disagreement over Dr. Carlton's liability for maintenance and veterinarian costs incurred in the care and feeding of his mares and the six foals. Dr. Carlton maintains that Griffin agreed to cover these costs in return for one half of the foals, while the government argues that Griffin and Carlton agreed to split these costs in half.

As to the first part, the stud fees, Dr. Carlton has submitted in his affidavit a list of the items agreed to by Bruce Griffin in this transaction. He has also submitted the affidavits of two witnesses to the agreement and, after the government's response was filed, the affidavit of Bruce Emery Griffin, the other party to the agreement, to substantiate his claims. According to these affidavits, Griffin agreed to be responsible for all of the expenses related to Dr. Carlton's mares. They would be bred to Roman's Straw Man with no stud fee. In return, Dr. Carlton agreed to pay for the insurance on his mares and agreed to allow the D.K.G. Ranch to keep one half of the foals born to his mares. All the foals would be the responsibility of the D.K.G. Ranch until time for distribution or race training.

The government believes that Dr. Carlton agreed to pay half the usual stud fee. This belief is based primarily on the affidavit of Paul Aduddell, the ranch custodian. The contents of his affidavit, however, are based entirely on three hearsay sources: Melody Beezley, a ranch employee under Griffin; a review of D.K.G. Ranch records; and a conversation with Lewis Wartchow, the representative for Dr. Carlton. As demonstrated by her affidavit, Melody Beezley's belief that there was an agreement to split all costs, including stud fees, is based entirely on things she heard Bob Geer, Griffin's stallion manager, say, and by some notation in some records that she saw. Presumably, the records she saw are the same ones Aduddel saw that are attached as exhibits to the government's response.

■ None of the evidence submitted by the government is sufficient to raise a factual question on the issue of stud fees. The Court cannot credit hearsay statements, especially when none of those statements were made by parties to the agreement. The documents submitted as attachments are also hearsay. Even if this fact is overlooked, none of those documents even mentions stud fees. In this Court's opinion, the affidavits of the two parties to the agreement and two witnesses to the agreement conclusively establish that Dr. Carlton was not to pay any stud fees.

■ By the same token, this Court cannot credit the hearsay statements made by Paul Aduddell and Melody Beezley on the issue of responsibility for maintenance and veterinarian costs. The documents submitted, also hearsay, do not establish an

agreement to pay half of the costs even if the defect of hearsay is ignored. The documents are denominated as "charge slips," but there is no indication as to their purpose. Some say D.K.G. and Dr. Carlton will "go 50/50" on bills, but there is no indication as to the author of those statements or his knowledge of the agreement. In all, only approximately five "charge slips" contain this notation. By the same token, three say "do not send bill," and the remainder say nothing at all about costs. In the face of four affidavits, two by the parties to the agreement, the proof offered by the government does not raise any factual questions regarding the agreement. The D.K.G. Ranch was to receive one half of the foals born to Dr. Carlton's mares. This was the only payment D.K.G. was to receive.

Dr. Carlton is not responsible for the bills sent by the United States government for the care, boarding or breeding of any horses owned by him which have been boarded or are being boarded on the D.K.G. Ranch. Dr. Carlton is also not liable for any stud fees. Any such bills are hereby cancelled.

The D.K.G. Ranch is entitled to keep one half of the foals born to Dr. Carlton's thirteen mares. Apparently there were eleven foals born to those mares. This Court is in no position to determine which foals Dr. Carlton should keep, nor has this Court been asked to make such a determination. This matter will be best resolved by an agreement between Dr. Carlton and the owner of the D.K.G. Ranch.

### B. Plaintiff's Motion to Alter or Amend the Judgment

On December 19, 1985, the plaintiff filed a Motion to Alter or Amend the Judgment. The motion makes three separate arguments. The first two arguments are directed at the judgment entered by this Court on December 9, 1985. The last argument concerns the gold and jewelry that is the subject matter of a separate cause of action in which no judgment has been entered. Each argument will be considered separately.

1. Scope of Government Knowledge

As noted earlier, based on Judge Hoeveler's interpretation of the pre-plea agreement, the government may not forfeit any property owned by Bruce Emery Griffin and known to the government at the time of the bargain. *See* Order Clarifying Plea Agreement, *United States v. Bruce Emery Griffin*, No. 82–72–CR Hoeveler, at 3–4 (S.D.Fl., Dec. 6, 1985). In the same order, Judge Hoeveler concludes that the government knew about the ranch, thus protecting it from forfeiture. In describing the ranch, however, the judge added the words "the real estate" in parentheses. Because of this, the government argues that a new trial should be granted to determine whether they knew about the horses, equipment and household furnishings on the D.K.G. Ranch at the time of its seizure, and the bank accounts in the D.K.G. name. They contend that Judge Hoeveler's parenthetical description means they knew about the real estate but nothing else.

It is likely, however, that Judge Hoeveler added the parenthetical to avoid prejudicing subsequent determinations of government knowledge about the seized cars, gold and jewelry. In his order Judge Hoeveler discusses the need for subsequent determinations of the government's knowledge about some of the properties found on the ranch, describing those properties as "the gold bars, etc." *Id.* at 3. There is no indication that these other properties would include horses, equipment or furnishings.

Logic dictates this interpretation of Judge Hoeveler's order. It has been well documented that the government knew Bruce Emery Griffin was linked to a horse ranch in Texas. On the day his plea bargain was accepted, his attorneys mentioned to the Court that Griffin was involved in operating such a ranch. Transcript of Hearing Before the Hon. William M. Hoeveler, Sept. 20, 1983, at 18. When he was sentenced, Griffin's attorneys argued for leniency because Griffin had given up drug

**1554**

trafficking in favor of his horse breeding and showing business. Transcript of Sentencing, November 8, 1983, at 39. The government knew Griffin was operating a horse ranch. It strains credibility to maintain that the government thought a horse ranch consisted only of real estate. If they knew Griffin was operating a horse ranch, by implication they knew he had horses, barns and equipment for those horses, housing for himself and at least some of the people working on the ranch, and bank accounts for ranch expenses and profits.

It is possible the government did not realize the full extent or value of the horses, equipment or improvements on the ranch. They may have believed, for example, that one of the houses on the ranch was worth one hundred thousand dollars when it really was worth five hundred thousand dollars. It would make little sense, however, to conclude that the government only knew about one hundred thousand dollars worth of house, and allow them to forfeit the difference. It is impossible to draw such lines.

The plaintiff's interpretation of the parenthetical phrase in Judge Hoeveler's order is also inconsistent with actual facts. The D.K.G. Ranch is composed of several separate tracts of land. It is apparent that the government was not aware of all the tracts included until after the seizure. In other words, it is more likely that the government knew about the horses than all of the real estate at the time of the plea agreement. This does not mean, however, that the government may forfeit land they did not know about, since this would require more impossible line drawing. The government knew the ranch consisted of some real estate; it should not benefit from imperfect or incomplete knowledge concerning the exact amount of real estate involved.

While it is logical to assume a horse ranch would have horses, it is not logical to assume that a horse ranch would have millions of dollars worth of gold and jewelry hidden in the trunk of a car parked on the premises. While the government may have

known that Bruce Emery Griffin had purchased some gold, it will require proof at a trial to determine whether they knew at the time of the plea bargain about the cars, gold and jewelry actually found on the ranch. No other questions concerning government knowledge need to be resolved.

### 2. Forfeiture of Community Property Interest

The jury found that Bruce Emery Griffin and Donna Krauss Griffin, his wife, owned the seized property. The plaintiff argues that Donna Krauss Griffin is not entitled to benefit from her husband's plea agreement, nor does she have any other defense to a forfeiture of her one-half community property interest in the seized assets. The government asks that the judgment be altered to allow a forfeiture of one-half of the seized property.

■ The law of Texas applies to property owned by people married elsewhere but domiciled in Texas. Tex.Fam.Code Ann. § 4.01 (Vernon 1975). The Griffins were living on the D.K.G. Ranch at the time of its seizure, and had expressed an intention to stay in Texas during sentencing in Florida. The Griffins were therefore domiciled in Texas. *See, e.g. Crowley v. Glaze,* 710 F.2d 676, 678 (10th Cir.1983) (presence and intent define domicile).

■ In Texas, property possessed by both spouses is presumed to be community property. Tex.Fam.Code Ann. § 5.02 (Vernon 1975). The D.K.G. Ranch and all other seized items are thus presumed to be community property. If they were not community assets, they would in all likelihood be the separate property of Bruce Emery Griffin, and the present argument would be irrelevant.

■ The spouses interests in community property are of equal dignity, and are joint and undivided. *Broday v. United States,* 455 F.2d 1097, 1100 (5th Cir.1972) (spouses interests are "equal and equivalent"); *Lifson v. Dorfman,* 491 S.W.2d 198, 200 (Tex.Civ.App.—Eastland 1973, writ ref'd n.r.e.) (joint ownership). As a result,

Bruce Emery Griffin owns an undivided one-half interest in each and every item of property seized. No item could be sold without affecting his interest. Since he has an ownership interest in each piece of property, the plea agreement protects everything as long as it was known to the government at the time of the bargain.

 This Court cannot divide the community property in order to enable a sale. Community property in Texas may be divided in a divorce proceeding or by agreement of the spouses. Tex.Fam.Code Ann. § 3.63 (Vernon Supp.1986) (division on divorce); Tex. Const. art. 16, § 15 (Vernon Supp.1986) (division by agreement). Historically, community property cannot be divided to satisfy a forfeiture. *See generally Hardin v. Hardin*, 217 S.W. 1108 (Tex. Civ.App.—Texarkana 1920, no writ). This Court is unwilling and unable to make a division in this case.

Even if a forfeiture of a wife's one-half interest was somehow cognizable under Texas property law, it is still unclear whether the government is entitled to forfeit Donna Krauss Griffin's share. She has failed to raise any defense only because she has asserted a fifth amendment privilege against being forced to do so. This Court cannot conclude that a forfeiture of her interest is appropriate under these circumstances.

### 3. Gold Bars Purchased Before 1978

The plaintiff argues that there was insufficient evidence to support the jury's finding that the seized gold and jewelry was purchased before 1978. No issue was submitted to the jury with regard to the jewelry, and no finding has or will be made that it was purchased before 1978. The only issue now before the Court concerns the gold.

 There was evidence proving Bruce Emery Griffin's purchase of some gold bars prior to 1978. Two of the seized gold bars were positively identified as being among the group of bars purchased before 1978, and the other seized gold bars were similar to the bars bought before 1978.

Under these facts, the Court cannot conclude that the evidence was insufficient to support the jury's verdict. This does not end matters concerning the gold bars, but any further issues will be addressed in the context of the severed proceeding involving the seized cars, gold and jewelry.

### C. Plaintiff's Motion to Set Aside Judgment and for Judgment Non Obstante Verdicto, or in the Alternative, Motion for New Trial

In addition to its Motion to Alter or Amend the Judgment, the plaintiff has filed a lengthy Motion to Set Aside Judgment and for Judgment Non Obstante Verdicto, or in the Alternative, Motion for New Trial. The latter motions contain a number of different but related arguments. For ease of reference, the Court will treat the arguments raised under the judgment notwithstanding the verdict heading separately from those raised under the new trial heading.

### 1. Motion for Judgment Notwithstanding the Verdict

The standard to be employed by a district court when reviewing a motion for judgment notwithstanding the verdict has been "firmly established" and thoroughly explained in this Circuit. In determining whether the motion should be granted, the Court should consider all the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A

mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Nichols Construc. Corp. v. Cessna Aircraft Co.*, 775 F.2d 1325, 1331 (5th Cir. 1985); *quoting Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc).

In listing its reasons for requesting judgment notwithstanding the verdict, the government repeats the three arguments it raised at trial in its motions for directed verdict. First, they argued that the forfeiture of the D.K.G. Ranch could be accomplished regardless of the pre-plea agreement made in Florida. Second, they urged that allowing the jury to decide the question of ownership would open the door to Bruce Emery Griffin's attempt to pierce his own corporate veil. Since the lifting of a corporate veil requires equitable intervention, the question should not go to a jury, but should be resolved in the government's favor because the equities are allegedly on its side. Finally, the plaintiff contended that corporate ownership of the property was established as a matter of law.

In expanding its argument on these three issues, however, the government's motion deletes the third and substitutes a different argument concerning judicial admissions made by Griffin which allegedly concede the issue of corporate ownership. Since questions concerning the weight of the evidence on the corporate ownership issue are actually discussed later in the government's motion, the Court will treat them under the new trial hearing. Each of the remaining three arguments will be discussed separately.

### a. Pre-plea agreement.

Issues concerning the pre-plea agreement are now moot, since the court that accepted the agreement has interpreted it in a manner that precludes forfeiture of property owned by Bruce Emery Griffin and known to the government at the time. Even if this Court wanted to intervene now, no reason is offered by the government to allow such an act. It would be improper to disregard the decision of another court. The agreement is valid, will be enforced, and proscribes forfeiture. That is the law of this case.

Ever since the claimants filed their motion to specifically enforce the agreement, both sides have concentrated their efforts in Florida. As the government quietly concedes in the present motion, the arguments with regard to the plea bargain were "presented by the United States before Judge Hoeveler," and were "known by this Court." Knowledge of arguments raised in a collateral proceeding in another court does not bestow upon this Court either the duty or the right to sua sponte decide those arguments. Knowledge allowed this Court to interpret Judge Hoeveler's decision, as was done in this Court's order of September 23, 1985. It allowed nothing more.

A token mention of the plea agreement in this Court was made in the claimant's motion for change of venue, filed in August of 1984. The government filed a response, but confined its response to the venue question. The merits of the plea agreement were not raised. The venue question was decided in favor of Florida, at least as far as the plea agreement was concerned, in this Court's September order. *See Memorandum Opinion and Trial Setting Order* 4–11 (September 23, 1985). The merits of this decision have been rehashed in this order. *See supra* p. 1548–49.

Issues concerning the scope of government knowledge and degree of government authority were raised by the plaintiff in its First Motion for Partial Summary Judgment filed in December, 1984. The fact that this was an in rem forfeiture was

mentioned. Arguments concerning inception of title at the moment of the illegal act were not mentioned. By this time, hearings were well under way in Judge Hoeveler's Court concerning the issues in the government's motion and more. The government has never offered any argument or authority that would allow this court to interpret the bargain. In fact, the government conceded that waiting for a decision from Judge Hoeveler was "perfectly reasonable." *See* Transcript of Hearing in Chambers Before the Honorable William M. Steger, December 17, 1984, at 38. It was clear that the court in Florida was providing the best and proper forum.

 Issues arising out of the in rem nature of this forfeiture were never presented to this Court. Issues concerning the scope of the authority possessed by the government's agents or the breadth of the plea agreement were presented in an untimely fashion in an improper forum. Although unlikely, these arguments may ultimately decide this case in the government's favor, yet this Court was never afforded a genuine opportunity to review them. As a practical matter, the government should have told the Court about the plea agreement issues on the night of March 13, 1984, so that some determination could have been made before the seizure. The government never gave this Court that chance.

### b. Piercing a corporate veil.

The government devotes more than one fourth of the material in the present motion to the argument that it would be inequitable to allow Bruce Emery Griffin to pierce his own corporate veil. The Court could agree with the government's argument, and yet it would make no difference in the result of this case. The government's argument assumes facts that are not supported by the evidence, a circumstance which renders the issue entirely irrelevant. There are no veils to be lifted in this case.

 If the Court had jumped to the conclusion that the corporations actually owned the seized property, it is then true that the veil of those corporations would have needed to be lifted in order to attribute ownership to Bruce Emery Griffin. The government did jump to this conclusion, and in so doing it attempted to cloud the real issue in the trial. The question of whether the corporations actually owned the seized property was in reality the very question which the jury had to decide. If the corporations never owned the property, there would be no need to pierce a corporate veil. There is no such need in this case, since the jury decided the corporations did not own the property, but rather the Griffins did.

 Based on the evidence presented, this Court is certain that other reasonable people could and would agree with the jury's conclusion. This is more than enough to survive the government's motion. Judgment notwithstanding the verdict would be inappropriate in the present case. *See generally Crowe v. Lucas*, 595 F.2d 985, 989 (5th Cir.1979).

The claimants, who had the burden of proof on the issue, presented a detailed account of how the seized property was acquired. Numerous witnesses testified that Bruce Emery Griffin negotiated most of the purchases and provided all of the money. He held himself out as the owner and most people treated him as the owner. All this could have been excused if some evidence had been presented tending to show that Griffin was acting merely as an agent for the corporation. The testimony was to the contrary, however.

Of the three automobiles seized, one, the Mercedes, was not registered in any state. The other two were registered to "D.K.G. Ranch" and "D.K.G. Appaloosa." None were registered to "D.K.G. Appaloosas, Inc." or "Nabuc, Ltd.," the official legal names of the two corporations involved.

Of approximately 150 horses on the ranch at the time of seizure, 30 to 35 of them were under an open registration, meaning no owner was listed. Some were registered to Donna Krauss Griffin, and some were registered to the "D.K.G.

Ranch." The bulk of the remainder were registered as "D.K.G. Appaloosa." Only one was registered to "D.K.G. Appaloosas, Inc." (Since the seizure, horses have been registered to "D.K.G. Government Control" and have been given such colorful names as "Forfeiture," "Interrogator," and "F.B.I. Guy.") Even assuming that horse registrations are legal documents of title, which was never shown, only one of the horses was registered to a corporation.

Much of the ranch equipment and other items of property were purchased with checks from the Bank of Nova Scotia in the Bahamas. These checks did not have a corporate name printed on them, but instead looked like cashier's checks and functioned like cash. The government's witness, F.B.I. Agent Joseph Masterson, did not know the source of the funds behind the checks, but even he speculated that it was Bruce Emery Griffin, not the corporations. Griffin confirmed this speculation during his testimony. Of the four domestic checking accounts maintained at the Pilot Point Bank in Texas, only one bore a corporate name.

■ In order to do business as a corporation, such an entity must use its corporate name. This is the rationale behind the strict requirements for unique corporate names. *See* Tex.Bus.Corp.Code Ann. art. 2.05 (Vernon 1980). To say that the other names used were aliases for the corporations ignores the requirements for operating under an assumed name, and the penalties for failure to comply. Tex.Bus. & Comm.Code Ann. § 36.11, 36.25 (Vernon Supp.1986). If Bruce Emery Griffin wanted his corporations to own this property, he failed to accomplish his purpose. He also did not fool anyone, including the government.

None of the personalty or other items of property had any documents proving ownership. Testimony and common sense bore out the fact that the furniture, clothing, and other similar goods were owned by the Griffins. The Griffins' initials on the jewelry dictate a similar conclusion for those assets. Testimony from the sellers of the rest of the property, including the gold, confirm that Bruce Emery Griffin bought it for himself. This evidence and more pointed to Bruce Emery Griffin as the true owner of the seized property.

At least three facts favored the government. The real estate is deeded to "Nabuc, Ltd." An accountant who worked on the books for the ranch treated it as a corporation. Finally, one or two people were careful to refer to the corporations rather than saying Bruce Griffin owned the property. The first of these three facts is by far the most persuasive, yet it falls far short of requiring a government verdict by itself. *See infra* p. 1567–1568. In short, there was substantial evidence to support a finding that Bruce Emery Griffin owned the property, and there was also some evidence to the contrary. A jury question was raised, and they performed their function as finders of the facts by weighing the conflicting evidence and inferences and determining the credibility of the witnesses. *Nichols Construction Corp.*, 775 F.2d at 1331. They found in favor of the claimants, and no judgment notwithstanding the verdict would be appropriate.

■ Even if the Court indulged a corporate veil argument in this case, the government's reliance on that argument given the facts developed is misplaced. The rules cited by the government were designed to protect those who relied upon the existence of a distinct corporate entity. *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.*, 523 F.2d 744, 758 (5th Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976). In this case, however, no one, including the government, relied on the existence of distinct corporations. Everyone was concerned with Bruce Emery Griffin, at least until it became necessary to avoid the terms of a pre-plea agreement.

■ Another reason requires rejection of the government's arguments. It is true that shareholders cannot hide behind the corporate veil, then discard it when it is no longer useful. *See St. Paul Fire & Ma-*

*rine Insur. v. Vest Transportation Co., Inc.,* 666 F.2d 932, 939 n. 9 (5th Cir.1982); *Delta Pipe Fabricators, Inc. v. Bullock,* 638 S.W.2d 652, 653 (Tex.App.—Austin 1982, writ ref'd. n.r.e.). The facts of this case suggest, however, that regardless of his intent, Bruce Emery Griffin never succeeded in hiding behind a corporate veil. With the possible exception of the realty, the corporations never owned the seized property. The government is not the type of party intended to be protected by a refusal to pierce a corporate veil, and Griffin is not the type of party intended to be punished by the same. There are no corporate veils in this case, and there is no reason to manufacture any.

### c. Mockery by admission.

In their original pleading, filed on March 26, 1984, the claimants alleged that Bruce Emery Griffin was authorized to file a claim on behalf of D.K.G. Appaloosas, Inc. and that the corporation owned the seized property and was entitled to its return. In the alternative, the claimants alleged that Bruce Emery Griffin was the legal and beneficial owner of the property. The pleading was verified by Bruce Emery Griffin.

The government asserts that the allegations made by Griffin as agent for the corporation are binding on him individually as judicial admissions. Using perhaps inappropriately strong language, the government argues that Griffin's sworn statement that the corporations own the seized property makes a mockery of the jury's verdict and of the entire judicial system. The plaintiff urges the Court to hold Griffin to his word and find that the corporations own the property.

There is some authority for the proposition that factual assertions in pleadings and pretrial orders are binding judicial admissions. *See White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir.1983) (admissions made in pleadings and repeated in pretrial order and proposed findings of fact were binding). In this case, however, there are no unequiv-

ocal admissions often repeated up to the time of trial. Instead, the highlighted statements in this case merely set out alternative claims in a pleading. A party has a right to state separate claims in a pleading regardless of their consistency. Fed.R. Civ.P. 8(e)(2). This means the pleading may also present alternative statements of the facts. 2A *Moore's Federal Practice* 8–222 (1985). The claims were made in the alternative, and the second alternative, ownership by Bruce Emery Griffin, prevailed on the merits.

The government could not have raised this argument because it loathes any inconsistency. In April of 1985, the government filed a motion to strike the pleadings upon which they now rely because, among other asserted reasons, Bruce Emery Griffin was not authorized to act on behalf of the corporations. In addition, the premise of the government's argument is that the actions of Griffin as a corporate agent bind the corporations, yet they also maintain that actions of government agents have no effect on the government, and so evidence concerning the latter should have been excluded. The statements in claimants' pleadings do not justify judgment n.o.v.

The government's Motion to Set Aside Judgment and for Judgment Non Obstante Verdicto is hereby DENIED. The alternative is considered next.

### 2. Motion for New Trial.

In the context of the present case, a new trial would be appropriate if this Court decided the verdict was contrary to the weight of the evidence, the trial was unfair, prejudicial error was committed in its course, or some other reason based on this Court's appraisal of the fairness of the trial and reliability of the jury's verdict required one. *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir.1985); Fed.R.Civ.P. 59(a). In deciding whether the verdict was contrary to the weight of the evidence, the trial court should weigh "all of the evidence, but need not view it in a light favorable to the nonmoving party." *Id.* at 613. Among the factors allegedly showing prejudicial error in the course of

this trial, the government points to errors purportedly made in the admission of evidence. *See, e.g. Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). The government also questions the reliability of the jury's verdict due to an asserted failure to follow the Court's instructions. 6A *Moore's Federal Practice* 59–124–59–126 (1985). The final decision on whether to grant a new trial is left to the district court's discretion, with the proviso that the court should always respect the collective wisdom of the jury and should not merely substitute its opinion for the jury's verdict. *Smith,* 773 F.2d at 613.

The portion of the government's motion urging a new trial consists of a jumbled array of different arguments. For ease of consideration, the Court will group these arguments according to their subject matter, and then will discuss each individually.

a. Repetition of earlier arguments.

Plaintiff begins its motion for new trial by reasserting the reasons presented in their arguments for judgment notwithstanding the verdict. None of the results stated in the previous discussion of those arguments changes in light of the less strict standards governing motions for new trial. In discussing those arguments under their new heading, however, plaintiff does add some new dimensions that warrant further consideration.

■ Plaintiff argues that only the corporations had the power to convey the seized property, therefore conclusively establishing their ownership of it. This is an attempt to bridge the gap between this case and a case involving corporate veils. The argument is literally accurate only with regard to the real estate, where the deeds are in the name of Nabuc, Ltd. There were no documents of title concerning the remainder of the property that would preclude conveyance by the Griffins. Even if there were, the right to sell property is only one of several indicia of ownership. *See, e.g. Amalgamated Food Emp. Union Local 590 v. Logan Valley Plaza,* 391 U.S. 308, 319, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603 (1968) (ownership includes right to keep others from using the property); *Henneford v. Silas Mason Co., Inc.,* 300 U.S. 577, 582, 57 S.Ct. 524, 526–27, 81 L.Ed. 814 (1937) (ownership consists of a bundle of privileges, including the right to use the property); *United States v. Lutz,* 295 F.2d 736, 740 (5th Cir.1961) (laundry list of indicia). The claimants produced an abundance of evidence showing that the Griffins exercised all the prerogatives of ownership.

■ This last fact is true for the land as well as the other seized property. At a minimum, the Griffins are equitable owners of the land. Since the term "owner" is to be broadly defined in forfeiture cases, there was sufficient evidence to allow the jury to conclude that the Griffins owned all of the seized property. *United States v. $47,875.00 in U.S. Currency,* 746 F.2d 291, 293 (5th Cir.1984) (the term "owner" should be broadly construed to include anyone with a recognizable legal or equitable interest in the seized property).

■ The government also argues that Bruce Emery Griffin admitted operating as a corporation. Since questions concerning his statements in sworn pleadings have already been discussed, the Court will assume the government is referring to oral statements made in the course of the proceedings, including at the time of the seizure. These statements were accepted into evidence as admissions against interest. They did not conclusively prove corporate ownership, but were merely factors which the jury could weigh in reaching their verdict.

■ The government also asserts that the horse operation was conducted in the name of D.K.G. Appaloosas, Inc. since that corporate name was used on the ranch's books and records. There was an abundance of testimony, however, that the horse operation was conducted by Bruce Emery Griffin in his name, and that the vast majority of the people who had business dealings with the ranch assumed he owned it. In addition, the corporate name

was not on all records of the operation, including the checks used to make major purchases. Even if the corporate name did appear on the ranch's business documents, such books and records are not documents of title. They do not conclusively prove corporate ownership, but rather they merely tend to show such ownership. The jury was entitled to weigh any evidence of corporate names on ranch records against all the other evidence tending to show the Griffins owned the property. Their verdict speaks for itself, and certainly is not contrary to the weight of the evidence.

### b. Denial of a motion to compel.

The government also asserts that their pre-trial motion to compel production of bank records was denied, thus possibly denying them access to evidence which might have helped prove the corporate nature of the D.K.G. Ranch's business.

There are several unclear aspects to this argument. First, the government's motion to compel was not denied, but instead was granted at a hearing held on October 10, 1985 in a ruling subsequently reduced to writing in an Order Compelling Discovery signed on October 15, 1985. *See* Transcript of Hearing in Chambers Before the Honorable William M. Steger, October 10, 1985, at 10. The order set a deadline of October 18, 1985 for production of the requested documents. Apparently the government was upset because the claimants never produced any bank records to help it prove corporate ownership of the seized assets.

This situation could only have been remedied by a motion for sanctions for failure to comply with the Court's order. On October 24, 1985, the government filed such a motion, seeking to strike the claims and enter a default decree of forfeiture. At a hearing held on October 28, 1985, the government argued that there might be Bahamian bank records showing that the funds used to purchase the seized assets might have come from some person or entity other than Bruce Emery Griffin. *See* Transcript of Hearing in Chambers Before the Honorable William M. Steger, October

28, 1985, at 10. This statement was made despite Griffin's admission that he provided all the funds and they were all derived from his illegal drug trafficking activities—an admission which would prove detrimental if Griffin ever lost his battle over the interpretation of his plea agreement.

For their part, the claimants asserted that they had produced all the documents within their control and that the bank records requested by the government simply did not exist. *See* Transcript of October 28, 1985 Hearing at 13. There may have been bank transaction records relating to cashier's checks issued from certificates of deposit held at a Bahamian bank. Those records belonged solely to the bank, however, since they were kept for the bank's benefit and not for Bruce Emery Griffin. They were not subject to the Court's order compelling discovery.

In response, the government contended that Bruce Emery Griffin may have been covering up his possession of other records. This contention was based on the fact that he had forgotten about records kept by Cobalt, Ltd., a Cayman Islands corporation owned by Griffin but apparently not connected with these proceedings. This contention amounted to little more than pure speculation.

This speculation is confusing in light of F.B.I. Agent Joseph Masterson's testimony at trial that he thought Bruce Emery Griffin provided the money contained in the Bahamian certificates of deposit. It is further confused by the Internal Revenue Service's treatment of Griffin's taxes, since they included in his income amounts equal to the prices of the property he acquired. Apparently the I.R.S. believed the money came from Griffin, and not some corporation or third party. Finally, Bruce Emery Griffin admitted the money was his, and acknowledged using it to purchase the property.

To support the imposition of sanctions, the government provided mere speculation as to the existence of bank records. Their own witnesses indicated that Bruce

Emery Griffin was the source of the funds, rather than a corporation or another person. The claimants maintained they had produced all they could, and that the requested records did not exist. Under these circumstances, it did not seem like an abuse of this court's discretion to refuse to strike all the claims because of a failure to produce documents the claimants said do not exist.

Even if bank records like those requested do exist, there is little chance the government was prejudiced by not having them. Only the government's speculation supports the conclusion that the records would have helped to prove corporate ownership. The copies of the Bahamian cashier's checks produced at trial contained no link to any corporation, making it doubtful that other bank records would have revealed something different.

The likely reason the government wanted some bank records was to confirm rumors of over one hundred million dollars deposited in Griffin's name in Bahamian accounts. *See* Transcript of October 28, 1985 Hearing at 12–13. These funds, if they do exist, have nothing to do with the assets already seized at the D.K.G. Ranch. At best, discovery of these accounts might have allowed the government to increase Griffin's tax liability or plan future forfeiture operations against him. Neither of these results would aid in the resolution of the present controversy. Given the fact that pursuit of possibly nonexistent bank records likely would have forced an unnecessary delay in the trial, this Court saw no reason to sanction the government's fishing expedition.

c. Alleged evidentiary improprieties.

▮ The plaintiff complains of evidentiary rulings made by the Court allowing introduction of some matters the plaintiff feels should have been excluded. As an overview, many of the Court's rulings were made out of a sense for the jury's need to understand their purpose. They could not be asked to decide who owned the seized property without some idea of why the question was important. They needed to know why the government was trying to prove that a convicted drug smuggler did *not* own the property, and vice-versa. If there was any hesitation on the Court's part, it was induced by a fear that when they understood the scenario, the jury might decide the case not on the evidence, but in a manner designed solely to punish Bruce Emery Griffin for his criminal activity. This fear ultimately proved to be groundless. In any event, the jury was entitled to know the "setting" of the case. *See, e.g. United States v. Roberts*, 548 F.2d 665, 667 (6th Cir.) *cert. denied* 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977) (jury cannot be expected to make its decision in a void). In addition, in federal court it is proper to tell the jury the effect of their answers to special interrogatories. *Perricone v. Kansas City Southern Ry. Co.*, 704 F.2d 1376, 1378 (5th Cir.1983); Fed.R.Civ.P. 49(a).

▮ As for the specific challenges to evidentiary rulings, the general rule is that all relevant evidence is admissible unless it is proscribed by some statute or rule. Fed.R.Evid. 402. The burden is on the party opposed to admission of evidence to show a reason for its exclusion. *United States v. Dupee*, 569 F.2d 1061, 1063 (9th Cir.1978). Evidence is relevant if it has a tendency to prove an issue of consequence in the litigation. *United States v. Grassi*, 602 F.2d 1192, 1195 (5th Cir.), *rehearing denied* 606 F.2d 321 (1979), *cert. denied* 450 U.S. 956, 101 S.Ct. 1415, 67 L.Ed.2d 381 (1981).

▮ Many of the government's evidentiary challenges are premised on Rule 403 of the Federal Rules of Evidence. This rule provides that relevant evidence can be excluded if its probative value is substantially outweighed by its prejudicial effect. Relevant evidence is inherently prejudicial, however. *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *rehearing denied*, 597 F.2d 283, *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979). It is only *unfairly* prejudicial evidence which can be excluded. Evidence is unfairly prejudicial if it has "an undue tendency to suggest a decision on an improper basis,

commonly, though not necessarily, an emotional one." *Grassi*, 602 F.2d at 1197, *quoting* Notes of the Advisory Committee on Proposed Federal Rules of Evidence, 28 U.S.C.A. Rule 403. This is akin to the general rule that incorrect rulings on admissibility of evidence should be reversed only if a substantial right of a party is affected. *Muzyka v. Remington Arms Co., Inc.*, 774 F.2d 1309, 1312 (5th Cir. 1985); Fed.R.Evid. 103(a).

From this foundation, a discussion of the government's complaints may proceed. Its objections are aimed at three matters. First, the plaintiff challenges the admission into evidence of the pre-plea agreement. Second, it argues against the introduction of Internal Revenue records concerning Bruce Emery Griffin's taxes. Finally, it complains about admission of statements made by government agents.

 The pre-plea agreement was relevant for at least two reasons. First, it was essential to explain the setting of this case. If there had been no pre-plea agreement, there would have been no trial concerning the issue of ownership. Without this document, the government could have forfeited the property long ago. With it, the government was forced to refute Bruce Emery Griffin's proof of his ownership, a reversal of the government's normal role in forfeiture cases.

Second, the agreement was vital to the issue of the credibility of the witnesses. Only by fully comprehending the plea agreement could the jury understand Griffin's interest in saying he owned the property and the government's interest in saying he did not own it. This was critical if the jury was to consider the potential bias and prejudice of the witnesses.

The government relies on this Court's choice of Florida as the proper forum for questions regarding the scope and interpretation of the plea agreement. It argues this decision means the bargain was irrelevant to the Texas trial on the ownership issue. The venue decision only precluded an interpretation of the scope and meaning of the bargain, however, not the jury's need to consider it when weighing the credibility of the testimony.

Since it was relevant, the pre-plea agreement was admissible unless the government could present some statute or rule excluding it. The government offers only Rule 403, and an argument that its admission was "highly prejudicial," "extremely harmful," and "prevented a fair trial." No reasons support these conclusory statements. Like all relevant evidence, the agreement was prejudicial, but it was harmful to both parties. It demonstrated to the jury the vested interest both sides had in the positions they took in their testimony. If anything, the agreement added to the evidence reminding the jury of the claimant's illegal activities. It was not equally harmful to the government.[1] This Court does not believe the plea agreement suggested to the jury an improper basis for a decision, nor does it believe the jury was merely trying to decide if the government breached the bargain. It was not unfairly prejudicial.

 Introduction of Internal Revenue Service records was proper because those records were also relevant. The I.R.S. took the value of property acquired by Bruce Emery Griffin, assumed that if he bought it, he must have had income sufficient to supply the purchase price, and therefore added the equivalent of the purchase price to his income. This was done to reconcile Griffin's reported income with his actual income. It also demonstrated the I.R.S.'s belief that Bruce Emery Griffin purchased the seized property with his money, rather than some corporation. Because of penalties imposed, this evidence also suggested that Griffin purchased the property in the name of his corporations, a fact of benefit to the government. Since most of the seized property did not have

---

1. A troubling question arises if the government's belief that the agreement was extremely harmful to their case was true. Was it so harmful because by trying to forfeit the D.K.G. Ranch, the government feels it really was breaking the promise it made in Florida?

documents of title, evidence concerning the purchase of the property was extremely relevant to the issue of ownership.

To justify exclusion of this evidence, the government again asserts prejudice, and speculates about how the evidence might have been weighed improperly by the jury. The I.R.S. reports were in differing respects useful to both sides. They were not unfairly prejudicial, since they did not suggest by themselves an improper reason for decision. As for the jury's consideration, nothing suggests a tainted result traceable solely to these documents. The jurors heard testimony supporting the government's arguments about the reports and they were entitled to draw their own reasonable inferences from it. Nothing suggests they drew any impermissible inferences. There is no conclusive evidence that they considered these reports at all.

Finally, statements made by government agents, primarily government attorneys, were also relevant. They related to opinions about ownership of the seized property, the central focus of the trial. They were as relevant and as necessary as all the other testimony from witnesses concerning their dealings with Bruce Emery Griffin and their belief in his ownership of the ranch.

The government asserts these statements were prejudicial and not probative. They were not unfairly prejudicial, however, and they were probative of the ownership issue. Equally prejudicial statements made by Bruce Emery Griffin at the time of the seizure and in his pleadings were also admitted into evidence.

The government also argues that admission of the statements was improper, citing *Taylor v. Allis-Chamber Mfg. Co.*, 320 F.Supp. 1381 (E.D.Pa.1969), *affirmed* 436 F.2d 416 (3d Cir.1970). The Court will interpret this as an argument that state-

ments by government agents are not admissible against the United States.

As a general rule, statements made by an attorney concerning any matter within the scope of his employment are admissible. *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir.1984); Fed.R.Evid. 801(d)(2)(D). Government attorneys in criminal cases are exempt from this rule, since they supposedly are uninterested in the outcome of the trial. In civil cases, however, where the adversarial process insures trustworthiness, statements by government attorneys are admissible. *United States v. Santos*, 372 F.2d 177, 180 (2d Cir.1967) (explaining difference between civil and criminal cases). *See also United States v. American Tel. & Tel. Co.*, 498 F.Supp. 353, 359 (D.D.C.1980); *Burkey v. Ellis*, 483 F.Supp. 897, 911 n. 13 (N.D.Al. 1979) (statements by government agents are admissible).

*Taylor*, the case cited by the government, discusses the treatment these statements should receive. If they are made in a pleading or in trial, or are sufficiently formal or conclusive, they may be treated as binding judicial admissions. No one has urged this result for the statements admitted in this case, and the Court did not treat them as binding. Instead, these statements were allowed merely as evidential admissions, since they were made within the scope of the authority of the government's attorneys. *See Taylor*, 320 F.Supp. at 1385. The weight to be given these statements was strictly a matter for the jury. In an effort to aid the jury and avoid prejudicial misconceptions, the Court instructed the jury at the time the statements were admitted that they were not binding on the government, and that they should consider matters like the time the statements were made and the knowledge of the person making them when weighing the statements.[2] *See Unit-*

---

**2.** The full text of the instruction reads as follows:

> Ladies and gentlemen of the jury, I am going to permit the admission into evidence of statements made by agents for the govern-

ment concerning Griffin's ownership of the property. These statements are not binding on the government, nor do they prove that the government believed that Bruce Emery Griffin owned the property. The government

ed States v. American Tel. & Tel. Co., 498 F.Supp. at 358 n. 14. This instruction was repeated in the charge. Under these circumstances, and with no reason offered by the government as to why the statements might lead the jury to make a decision on an improper basis, this Court cannot conclude they were unfairly prejudicial.

For the reasons stated, this Court is convinced that the challenged evidence was relevant, properly admitted, necessary to the jury's understanding of the setting of this case, and not unfairly prejudicial. Any other objections have not been preserved. No new trial on this basis is warranted.

### d. Jury misconduct.

Dissatisfied with the jury's verdict, and firm in its conviction that corporations owned the seized property, the government assumes the jury must have done something wrong. The government attacks the jury for failing to consider favorable evidence, and criticizes the jury for placing too much weight on unfavorable evidence. Since it was the jury's function to weigh the evidence presented, it is difficult to see why error was committed when they performed their task. Nevertheless, the government's assertions will be treated as allegations of jury misconduct.

The task upon which the government has embarked is not easy. "Mere speculation will not suffice to prove that the jury reached its verdict improperly." *Luck v. Baltimore & Ohio Railroad Co.*, 510 F.2d 663, 668 (D.C.Cir.1975). Jury misconduct must be established by legally competent evidence, and this evidence cannot come from the jurors themselves. Fed.R.Evid. 606(b). Since the arguments presented by the government amount to nothing more than mere speculation, the analysis could end there. For the sake of consistency, it will not.

▮▮▮▮ The government suggests the jury ignored the Court's instruction to look first at documents of title. The only evidence to

support this assertion is the failure of the jury to request that documents of title be sent to the jury room. Except for land deeds naming Nabuc, Ltd., however, there were no documents of title to be sent. *See supra* pp. 1557–58. Assuming the failure to request documents of title was a dereliction of duty, the paucity of such documents means the government was not adversely affected. *See generally Anderson v. Breazeale*, 507 F.2d 929, 931 (5th Cir.1975) (generally, party not adversely affected by jury's failure cannot complain, unless elemental processes are challenged).

▮▮▮▮ Even if there were numerous documents of title, the failure to request them in the jury room does not mean they were not considered. It is equally plausible to assume the jury considered them when presented in open court, and did not feel a need to see them again. The government's position amounts to nothing more than mere suspicion, and this is insufficient to impeach a verdict. *See Bickart v. Union Barge Line Corp.*, 75 F.Supp. 572, 572 (W.D.Pa.1947), *affirmed*, 165 F.2d 959 (3d Cir.1948) (refusal to grant new trial despite strong and justified suspicion that jury disregarded court's instructions). Since courts should validate a jury's verdict "if at all possible," a presumption should be created out of the assumption that the jury did consider the documents of title. *Gaspard v. Taylor Diving & Salvage Co., Inc.*, 649 F.2d 372, 374 n. 2 (5th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982) (should proceed cautiously and uphold verdict if possible). The jury was not bound to find in favor of the government on ownership of the land even though the deeds named Nabuc, Ltd. *See infra* pp. 1567–68.

The government creates additional allegations of jury misconduct based on what the jury did and did not request to be sent to the jury room. It specifically mentions the declarations of trust concerning Grif-

---

may refute the statements, or explain the context in which they were made. In weighing these statements, you should consider the time when the statements were made, the

facts known to the person making the statements, and the authority and position of the person making the statements.

fin's ownership of the corporations, and assumes the jury improperly considered them in arriving at its verdict. This argument arises from the government's unproven conviction that the corporations owned the seized property, making it a corporate asset. The government fears the jury confused ownership of the corporations with ownership of corporate assets, in direct contravention of the Court's instructions.

The government overlooks the fact that the declarations of trust did not simply prove Bruce Emery Griffin owned the corporations, but they also suggested that Bruce Emery Griffin, rather than the corporations, owned the seized property. This conclusion is consistent with much of the testimony presented at trial. If the corporations never owned any of the seized property, the property was not an asset of the corporation and fears of piercing a corporate veil are unfounded.

 The declarations of trust were relevant, admissible evidence, a fact not contested by the government. As such, the jury was entitled to consider them. There is no evidence or reason to assume that in doing so, the jury disregarded the Court's instructions.

 The government makes other general statements about what the jury did or did not consider, all based on what they asked to see while in the jury room. The jury may consider any evidence admitted by the Court, and any or all of it may be sent to the jury room. The trial court has discretion regarding what exhibits are sent into the jury room. *United States v. Parker,* 491 F.2d 517, 521 (8th Cir.1973), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974). This Court does not send exhibits to the jury room unless they are requested. It would be inappropriate to conclude the jury considered only the evidence they requested. Many times juries do not request any exhibits, but this does not mean their verdict was not based on what they heard in the courtroom. It may be the jury weighs what they request more heavily, but since this is their function, it is not error. It may also be the jury

asks to see evidence in order to discredit it by clarifying misconceptions held by a minority of their members. Whatever their purpose, only suspicion and speculation can surmise it. This is insufficient to warrant a new trial.

### e. Improper jury argument.

The government also complains about one sentence contained in one of the three closing arguments made in behalf of the claimants. One of the counsel for the claimants said "if the government could do this to Pee Wee [Bruce Emery Griffin] today, they can do it to you tomorrow." According to the government, this amounted to an improper "Golden Rule" argument, citing *Loose v. Offshore Navigation, Inc.,* 670 F.2d 493, 496 (5th Cir.1982).

 As a general rule, in order to preserve error created by an improper jury argument, an objection must be made. *See generally Loose,* 670 F.2d at 496–97. A timely objection allows the court to correct the error, if any, at once. *Jenkins v. General Motors Corp.,* 446 F.2d 377, 383 (5th Cir.1971), *cert. denied,* 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972). No objection was made in this case.

 To justify a new trial, improper comments by counsel must be something that could have impaired calm and dispassionate consideration of the case by the jury. *Dixon v. International Harvester Co.,* 754 F.2d 573, 585–86 (5th Cir.1985). Assuming the comment by claimants' counsel was improper, it is unlikely it had any effect on the jurors. If there were drug dealers on the jury, perhaps they would have felt comfortable filling "Pee Wee's" shoes. It is unlikely that any of the actual jurors could identify with Griffin's plight, even if they wanted to do so. Their calm and dispassionate consideration was not impaired.

 The ultimate decision on whether to grant a new trial because of an improper argument rests within the trial court's discretion. *J.T. Gibbons, Inc. v. Crawford*

*Fitting Co.,* 704 F.2d 787, 799 (5th Cir. 1983); *quoting Meyers v. Moody,* 693 F.2d 1196, 1220–21 (5th Cir.1982), *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). The government's argument isolates one sentence at the end of one argument. Five attorneys addressed the jury over a period of nearly one hour. There was no objection made to the sentence, and it did not unduly affect the jury. No new trial is warranted.

### f. Government knowledge.

Finally, the government argues that since this Court will preside over a trial to determine whether the government knew about the seized cars, gold and jewelry at the time of the plea agreement, it should preside over a new trial on the issue of ownership. The alternative would be a piecemeal trial. In this Court's opinion, however, the government's argument would require an expensive and unnecessary retrial of the ownership issue.

The government knowledge issue to be tried in March of 1986 was not part of the trial in November of 1985. It will be a separate trial in a separate cause of action on an issue arising after the November trial. It is not really a new trial in the sense that it is not a retrial of any issue.

Even if it were a new trial, "if it clearly appears that the issue to be retried is so distinct and separate from the others that a trial of it alone may be without injustice," no new trial is required on all issues. *Westbrook v. General Tire & Rubber Co.,* 754 F.2d 1233, 1242, *rehearing denied,* 760 F.2d 269 (5th Cir.1985); *quoting Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). The issue of ownership is wholly unrelated to the issue of what the government knew about the property at the time the plea agreement was made. No reason independently warrants a new trial on the ownership issue. The knowledge issue can be and should be tried separately.

The government's Motion for New Trial is hereby DENIED.

### 3. Two More Reasons to Allow the Judgment to Stand.

In addition to the preceding discussion, at least two additional reasons warrant rejection of the government's attacks against the verdict. First, accepting its arguments could set a precedent which is contrary to the law in other forfeiture cases, and could chill future actions. Second, even if the verdict was contrary to the weight of the evidence, and it clearly was not, the claimants would be entitled to a judgment in their favor. This is true because even if the corporations did own legal title, the evidence supported finding an equitable ownership interest in the Griffins' favor. Finally, even if an equitable interest is insufficient under the broad definition of ownership in forfeiture cases, the corporations were probably third party beneficiaries of the pre-plea agreement.

As for the first reason, the bulk of the government's arguments stem from its belief that documents of title establish corporate ownership of the seized property. The previous discussion exposed the weakness of the evidence supporting those beliefs. Overlooking these evidentiary problems for the sake of argument, the government asks this Court to establish as a rule in forfeiture cases that documents of title are the sine qua non of ownership.

This position has already been rejected in numerous cases. *See, e.g. United States v. One 1945 Douglas C–54 Aircraft,* 604 F.2d 27, 28 (8th Cir.1979), *on appeal after remand,* 647 F.2d 864, 866 (8th Cir. 1981), *cert. denied sum nom. Stumpff v. United States,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 294 (1982) (possession of bare legal title, plane registration, was insufficient to prove ownership); *United States v. One 1976 Lincoln Continental Mark IV,* 584 F.2d 266, 267 (8th Cir.1978) (automobile title and registration insufficient by themselves); *United States v. One 1981 Datsun 280ZX,* 563 F.Supp. 470, 474–75 (E.D.Pa.1983) (Same). The distinguishing feature in these cases is simple. The government needed a broad definition

of ownership to justify a forfeiture since an innocent third party held the bare legal title. The rule should remain the same in all cases, including those like the present one, where the broad definition of ownership may prove beneficial to the claimants.

To follow the rule now suggested by the government would thwart the careful reasoning of many other cases. It would allow criminals to place title to their property in the names of innocent third parties, and thereby immunize themselves from forfeiture. Such a result cannot be condoned.

Given this discussion, it is possible the Court's instruction to look first for documents of title may have been too strong. It is certain, however, that the jury's verdict is not improper, even as to the realty, which was the only item of property with definite documents of title naming a corporation.

Assuming, again for the sake of argument, the existence of documents of title naming the corporations, the evidence presented supports imposing a purchase money resulting trust in the Griffins' favor. Bruce Emery Griffin provided the consideration for the purchase of all the seized property. Where property is placed in the name of one person or entity, but the purchase price is supplied by another, a presumptive trust in favor of the payor arises. *See, e.g. Elliott v. Mansfield,* 398 S.W.2d 442, 443 (Tex.Civ.App.—Beaumont 1965, writ ref'd n.r.e.). This recognized equitable interest is sufficient to establish an ownership interest under the broad definitions in forfeiture cases. *United States v. $47,875.00 in U.S. Currency,* 746 F.2d at 293 (broad definition of ownership in forfeiture cases).

Finally, even if this equitable interest was insufficient, and assuming there had been sufficient evidence to warrant a finding of corporate ownership of the seized property, or at least a new trial on the issue, the government still could not prevail. Judge Hoeveler has decided the plea agreement bars forfeiture of property unless it was unknown to the government at the time of the plea agreement. He went beyond a concern for corporate ownership when he specifically decided the real estate comprising the D.K.G. Ranch was shielded from forfeiture. He has determined what the government promised, and that promise must be fulfilled. *United States v. Kerdachi,* 756 F.2d 349, 351 (5th Cir.1985) (plea agreement promises must be fulfilled). Under these circumstances, it is likely Judge Hoeveler would have decided the corporations were intended beneficiaries of the plea agreement even if the jury had decided the corporations owned the seized property. It would be inequitable to allow the government to benefit from nominal corporate ownership, if the evidence had supported this conclusion. It would not have been allowed to use corporate ownership as an after-the-fact excuse for breaking its promise to Griffin. Except for items of property unknown to the Government, this forfeiture is barred.

### III. TAXATION OF COSTS

Without doubt, the most troubling aspect of these entire proceedings has been the time and money spent by the government to operate a multi-million dollar horse ranch. In the beginning, it was difficult to understand why the government wanted to be in the horse ranching business. Toward the end, it became apparent that the government's efforts might not benefit anyone other than a convicted felon while he served his term of imprisonment. The traditional rule that mechanically taxed litigation costs in favor of the prevailing party did not seem to fit this case. The money spent was for maintenance and upkeep, not for litigation costs like docketing fees. From the hundreds of thousands of dollars spent feeding his horses to the eight thousand dollars spent fixing his pool, it was difficult to justify huge expenditures of government funds without thinking that Bruce Emery Griffin should be required to repay some of the money even if he prevailed. For the reasons that follow, this Court now feels compelled to require Bruce Emery Griffin to pay a portion of the expenses for maintaining the D.K.G. Ranch.

## A. Equitable Considerations

The taxation of costs in civil actions is an equitable matter left to the discretion of a trial court, and it is equity above all else that compels this Court. From the outset it should be remembered that this is a unique case, and the decision made by this Court should be limited to this set of facts. This is not a case involving an innocent citizen being victimized by zealous or malicious government officials. If it was, the thought of taxing a million dollars in costs against such a prevailing claimant would be repugnant.

The prevailing claimant in this case, Bruce Emery Griffin, is anything but an innocent citizen. The opulence of the D.K.G. Ranch testifies to the extent of the wealth he accumulated illegally. He is a convicted drug smuggler and tax evader who has openly admitted using profits from unlawful drug trafficking to purchase the land and accouterments of the D.K.G. Ranch. Seized items like a fourteen karat gold toothpick with a diamond tip and gold screwdrivers with diamond initials make it seem as though Bruce Emery Griffin was running out of ways to spend his ill-gotten millions.

By the same token, zeal and malice do not mark the activities of the government officials involved in this case. The investigators and prosecutors concerned did not embark on a crusade to harass Bruce Emery Griffin or increase their fame, but instead sought to claim for the government what they believed in good faith belonged to the government. Given the stipulation that the government had probable cause, and the admission that drug money was used to purchase the seized assets, this belief in their claim is easily understood.

The decision to tax costs against the prevailing party in this case is not based solely upon the relative guilt of the victor or the innocence of the loser, however. Since the day of the seizure, the government's pursuit of its claim has forced it to spend tremendous sums to maintain the status quo at the D.K.G. Ranch. The effect of this spending will be felt, whether directly or indirectly, by all taxpayers.[3]

The money spent has not been wasted, however. According to reports from the ranch's custodian, conditions there are as good or better than they were on the day of the seizure. While the claimants may quarrel over the exact amounts spent, the ranch custodians made a studious and thorough effort to limit expenses to items reasonable and necessary to sustain the status quo at the ranch. Any dispute requiring an item-by-item accounting would be unnecessary and ultimately unproductive.

More importantly, it is indisputable that in the absence of this seizure, Bruce Emery Griffin would have paid many of the bills that instead have been paid by the government. Because of this, there can be no doubt that at least to some extent, Bruce Emery Griffin has benefitted from the government's expenditures on his property. He would be unjustly enriched if he was allowed to acquire those benefits without paying something for them.

The few arguments advanced by Griffin against taxing costs to him do not justify allowing him to escape the liabilities he would otherwise have incurred. Because of a plea agreement between the government and Griffin, property owned by him and known to the government is protected from forfeiture. Questions regarding own-

---

**3.** The expenses of the D.K.G. Ranch forfeiture were paid out of a special drug asset and forfeiture fund maintained by proceeds from other forfeiture actions. As a result, the government contends that the taxpayers have not had to bear the burden of maintaining the D.K.G. Ranch. This is not entirely true for at least two reasons. *1. Lost Spillover.* Every time the forfeiture fund exceeds five million dollars, the excess spills over into the Treasury. The money spent in this action reduces the amount available for spillover into the Treasury, with the lost revenue being made up by the taxpayers. *2. Loss of Public Confidence.* Regardless of the realities, the public believes that the money used to maintain the ranch came from their taxes. It is unlikely that it would be of much comfort to them if they learned that in reality, like some misguided Robin Hood, the government took money in one forfeiture only to give it back in another.

ership and government knowledge have been resolved in Griffin's favor with respect to the ranch, and it will be returned to him. In that sense, Griffin is a prevailing party.

He is not, however, a prevailing party in the traditional sense of this term. At best he is the beneficiary of a bad bargain made by the government in Florida. That bad bargain entitles Griffin to keep the D.K.G. Ranch and the horses, houses, and equipment that go with it, all worth millions of dollars. It does not entitle him to be unjustly enriched by the money spent to keep his ranch in first class condition.

 In addition to returning the seized ranch, to force the government to also bear the costs incurred in maintaining the ranch would in effect impose a penalty on them for attempting the forfeiture. A penalty is inappropriate when the government acts in good faith, with probable and reasonable cause for a seizure. A penalty is also inappropriate when its effect will unjustly enrich a person who openly admitted buying the property with proceeds from drug transactions.

 Bruce Emery Griffin also points out that in the early stages of these proceedings, he offered to post a bond and pay for government personnel on the ranch, if the government would allow him to retain possession. This could be construed as an offer to pay the expenses of maintenance during the pendency of these proceedings, and an admission that Bruce Emery Griffin should pay those costs. Even ignoring this, the forfeiture statutes pertinent to this case specifically provide that property seized shall not be repleviable. 21 U.S.C. § 881(c); 28 U.S.C. § 2464(a). Once the government made the decision in good faith to seize the ranch, they were forced to keep it. Rather than letting the value of the ranch decay, they spent two million dollars to keep the ranch in the best possible condition. While the government could not allow Bruce Emery Griffin to retain possession, this does not mean that they cannot call on him to repay any money spent to his benefit.

 It is true that since the day of the seizure, Bruce Emery Griffin has been denied possession of the ranch. There is in our society an intrinsic value placed on the right to possess and use one's own land. In this case, however, this equitable consideration pales in the light of closer scrutiny. Throughout the period of the seizure, Bruce Emery Griffin has either been in prison or facing a quickly approaching reporting date. He has not been harmed by being denied access to the ranch, since he could not have enjoyed access anyway. On the other hand, his wife, who according to the jury also has an ownership interest in the ranch, has been denied access except for occasional visits. She has also been denied the right to control ranch operations. By the same token, Bruce Emery Griffin has been denied the right to control the ranch through his wife. It is impossible, however, to place a dollar value on the impairment of a right to control property. It is an intangible right with an unquantifiable value.

Justice, however, does not dictate that in return for the impairment of these intangible rights, the Griffins should be allowed to return to the ranch free of obligation. Such a result denies the realities in this case. It ignores the pernicious source of the funds used to purchase the ranch, and overlooks the luxurious and selfish nature of a lifestyle typified by golden screwdrivers. It forgets the attempted deception of Bahamian and domestic corporations, and loses sight of the government's well founded good faith belief in the propriety of its seizure. Finally, it disregards the unsavory alternatives of unjust enrichment and government subsidization of a former drug smuggler.

Justice requires a more careful balancing of intangible rights and other equities, of unquantified value and government maintenance. The former requires moderation in the apportionment of costs by requiring the government to bear expenses that were for the benefit of the government or the custodian. The latter compels the taxation of

costs against the claimants for expenses that maintained and improved the property. In the Court's opinion, this result will adequately compensate the impairment of an intangible right while also respecting the compelling equities on the other end of the balance.

Any arguments in Griffin's behalf are heavily outweighed by the equities favoring taxation of a portion of the costs against him. Bruce Emery Griffin is a convicted drug trafficker who has admitted using tainted funds to purchase and support the D.K.G. Ranch. The government acted in good faith in an attempt to claim what it believed it owned. The government has paid bills that Griffin would otherwise have paid. The government paid those bills to keep the ranch in first class condition. Bruce Emery Griffin has benefitted from those expenditures, and he should be called upon to repay them.

### B. Legal Considerations

While emphasizing equitable concerns in reaching this decision, legal principles cannot be overlooked. In many instances, however, those principles were designed in accordance with equitable concerns, and can be tailored to fit the result in this case. In any event, the statutory, regulatory, and judicial pronouncements available on the issue of taxation of costs in civil forfeiture actions do provide some guidance.

#### 1. Statutes

The primary statute governing the return of seized property to a successful claimant is 28 U.S.C. § 2465.[4] With regard to the taxation of costs, this statute provides that when the court certifies that there was reasonable cause for the seizure, as has been done in this case, the claimant shall not be entitled to recover costs. It is unclear, however, whether this means that costs also should be taxed against the claimant. The two decisions that have addressed this question have reached opposite conclusions.

In *United States v. One 1970 Buick Riviera, Ser. No. 94–9870H920101*, 374 F.Supp. 277, 281 (D.Minn.1973), the court decided that section 2465 requires the successful claimant to pay all costs when there was reasonable cause for the seizure. The court allowed the government to recover the costs it incurred while storing the seized automobile, but deducted some of those costs to account for a delay attributed to the government between the time of the seizure and the time of the initial judicial involvement in the forfeiture proceedings. A different result was reached in *United States v. One 1969 Plymouth Two-Door Hardtop, Ser. No. RP23F9G158234*, 360 F.Supp. 488 (M.D.Al. 1973). Here the court held that section 2465 precluded claimants from recovering their costs from the government, but did not require the claimant to also bear the government's costs. These two cases are apparently the only ones interpreting section 2465 and discussing the taxation of government costs against a successful claimant. *See generally* 5 Fed.Proc., L.Ed., § 10:28 (1982, Supp.1985).

 This Court strongly favors the interpretation provided by the Minnesota court, taxing costs against the prevailing claimant. By refusing to tax costs, the Alabama court narrowly interpreted section 2465 and precluded the flexibility often necessitated by equitable considerations. When the government has reasonable cause to seize property, and does so under process issued by a court, it should not be penalized for maintaining and improving the property. In this case, equity favors an interpretation of section 2465 like the one given by the Minnesota court.

---

4. The full text of 28 U.S.C. § 2465 provides as follows:

 Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution.

It should be noted that both of the decisions cited are distinguishable from the present case. Both dealt with the taxation of storage costs for seized automobiles, a trivial amount in comparison to the expenditures in this case. By the same token, neither of the successful claimants in those cases derived any benefit from having their cars locked up for a period of time. In this case, however, the expenses were not merely for storage, but were for maintenance, upkeep, and repair. The claimant in this case has derived some benefit from the government's expenditures. Rather than providing a reason to disregard both cases, these distinctions provide an additional reason to favor an interpretation of section 2465 that allows the taxation of costs against the prevailing claimant.

The claimants have cited three additional cases purportedly interpreting section 2465 in their favor. After careful scrutiny, however, the Court believes they are either distinguishable, of limited relevance, or support the taxation of costs against the claimants.

The first of the three discusses the issue of depreciation. *United States v. One 1965 Chevrolet Impala Convertible*, 475 F.2d 882 (6th Cir.1973). The government had forfeited two automobiles used in violation of gambling tax laws. In light of the Supreme Court's decision in *United States v. United States Coin and Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), the trial court vacated the forfeitures and ordered the return of one of the cars and the proceeds from the sale of the other. In addition, the claimants sought reimbursement for the amount of depreciation the cars had suffered from the date of their seizure to the date of their forfeiture. The Sixth Circuit agreed with the trial court's decision directing reimbursement for those losses.

In so doing, the Sixth Circuit relied on the Supreme Court's conclusion in *United States Coin and Currency* that forfeitures under gambling tax laws were a constitutionally impermissible criminal penalty when executed in the face of a valid asser-tion of a fifth amendment privilege. Forcing claimants to bear the costs of depreciation in these cases also would be a constitutionally impermissible criminal penalty. This reasoning is of doubtful application in the present case. In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the Supreme Court explained the difference between gambling tax forfeitures and section 881 forfeitures, noting that while the former were like criminal penalties, the latter were not. *Id.* at 688, 94 S.Ct. at 2094. Since the forfeiture in this case was in rem, aimed not just at those significantly involved in a criminal enterprise but rather at the property involved, the constitutional underpinnings of the Sixth Circuit's opinion are of little relevance in this case.

Even if this Court decided that the present claimants should not bear the costs of depreciation, it is unlikely that depreciation has accounted for a net reduction in the value of the seized property. The horses, trucks and equipment are older, yet it is likely that as business property, much of their declining value would have been used as tax deductions. A large part of the decrease in the value of the horses occurred not because of the mere passage of time, but because of a sharp decline in the market for Appaloosas. The Griffins would have suffered those losses regardless of the seizure. On the other hand, the value of the land has probably increased. Through the maintenance and repair efforts of the custodian, many other portions of the property have been enhanced in value.

It is unlikely that the balance of depreciation versus appreciation would favor the claimants' argument. It is likely that no accurate accounting could ever be made to weigh the balance. Under these circumstances, this Court is unwilling to include the issue of depreciation in its cost analysis.

In *United States v. One Douglas A–26B Aircraft*, 436 F.Supp. 1292 (S.D.Ga.1977), the court dismissed the government's petition for forfeiture because of the long de-

lay between the seizure of the airplane and the initiation of judicial forfeiture proceedings. The court decided that the delay had deprived the claimant of its constitutional and statutory rights to due process and a prompt adjudication. In one cursory sentence, the court ordered the seized plane returned without obligation by the claimant for costs connected with storage and maintenance during the time of the seizure. 436 F.Supp. at 1300. The court provides no explanation for this result. At best, the case can be construed as holding that section 2465 does not *require* the taxation of costs against a prevailing claimant. Like the Alabama case discussed earlier, this case is distinguishable. It does not stand for the proposition that costs *cannot* be taxed against a prevailing claimant. This latter supposition is consistent with this Court's belief that in some cases, equity requires an interpretation of section 2465 which gives a trial court this flexibility.

Finally, in *United States v. One 1949 G.M.C. Truck*, 104 F.Supp. 34 (E.D.Va. 1950), the court decided that the government could not recover the costs of seizure it incurred prior to the issuance of legal process by a court. 104 F.Supp. at 38. Since the government's costs in this case were incurred after the issuance of legal process, this holding has no effect. The court did make one very important observation, however. If the *government* had been the prevailing party, it would nevertheless have paid the costs of seizure. 104 F.Supp. at 39.

In addition to section 2465, three other statutes govern the taxation of costs in forfeiture, as well as other, actions. *See* 28 U.S.C. §§ 1920, 1921, 2412. None provides guidance decisive in this action. Section 1920 merely enumerates the items normally taxable as costs. It is interesting for what is excluded, since costs for maintenance and upkeep of seized property do not fit easily into any of the six categories listed. Section 1921 discusses marshal's fees that are taxable, and does include actual expenses incurred for the keeping of attached property as an item of taxable costs. The only examples of actual ex-

penses listed in section 1921 are for transportation and storage, however, and not for maintenance or upkeep. Section 2412 allows the taxation of costs in favor of the prevailing party in an action where the United States is a party. The statute specifically refers to litigation costs, however, a term consistent with the six categories of taxable items listed in section 1920. While it makes sense to always tax litigation costs against the losing party, the maintenance and upkeep expenses involved in this case are a different breed of costs, with taxation governed by equitable principles.

### 2. Rules of Procedure

The primary provision in the Federal Rules of Civil Procedure governing the taxation of costs in civil suits is rule 54(d). This rule restates the prevailing notion that litigation costs are to be taxed in favor of the prevailing party, *unless* the court otherwise directs. While there is a strong presumption in favor of giving the prevailing party his costs, the ultimate decision on the matter is entrusted to the sound discretion of the trial court. *See Schwarz v. Folloder*, 767 F.2d 125, 127, 131 (5th Cir. 1985); *P.D.G., Inc. of Miami v. Nissan Motor Corp.*, 577 F.2d 910, 918 (5th Cir.), *cert. denied* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1978). As in all cases, the exercise of discretion calls for a balancing of the equities on a case by case basis.

Like the last three statutes, rule 54(d) is addressed to the taxation of litigation costs such as docketing or witness fees. Yet the expenses incurred in this case do not fit this label well. Because of this difference, any emphasis on favoring the prevailing party is minimized in the present case, and the importance of using other principles becomes even more apparent.

### 3. Analogous Concepts

In admiralty law, services or property used to preserve and maintain a vessel under seizure, if furnished upon authority of the court or an officer of the court, are known as "expenses of justice" or expenses *in custodia legis*. *General Electric Credit Corp. v. Oil Screw Triton, VI,*

712 F.2d 991, 995 (5th Cir.1983), *quoting General Electric Credit & Leasing Corp. v. Drill Ship Mission Exploration,* 668 F.2d 811, 815 (5th Cir.1982). The seizure in this case was made pursuant to a warrant of arrest issued by this Court, and the property was cared for pursuant to orders of this Court outlining the duties and powers of the substitute custodian. The services and property used to preserve and maintain the D.K.G. Ranch were advanced *after* it had been seized under legal process, and the expenses incurred are therefore analogous to those accruing *in custodia legis.*

Expenses of justice enjoy special favor in admiralty law, since they receive priority over all other claims when equity and good conscience so require. *Drill Ship Mission Exploration,* 668 F.2d at 815. This special favor has been accorded since 1927, when the Supreme Court decided that fundamental equitable principles required prevailing parties to pay expenses ordered by the court that enhanced the value of the property or fund to which they were entitled. The Court reasoned that these expenses necessarily inured to the benefit of the prevailing party who would claim the property or fund. *New York Dock Co. v. The Poznan,* 274 U.S. 117, 121, 47 S.Ct. 482, 484, 71 L.Ed. 955 (1927). The Supreme Court concluded that:

> [t]he most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the fund as an "expense of justice."

*The Poznan,* 274 U.S. at 121, 47 S.Ct. at 484 (citation omitted).

The *Poznan's* rule is of special importance to this case. The rule was not to be limited to cases in admiralty, but instead rested "upon principles of general application which should govern whenever a court undertakes the administration of property or a fund brought into its custody for the benefit of suitors." *The Poznan,* 274 U.S. at 120, 47 S.Ct. at 484. After the D.K.G.

Ranch was brought into the custody of this Court it had several suitors, including the Department of Justice, Bruce Emery and Donna Krauss Griffin, Nabuc, Ltd., and D.K.G. Appaloosas, Inc. To the extent that the prevailing suitor would win the right to possess the ranch, this Court held the property for their benefit.

The analogy is not perfect. The plaintiff's primary motive for wanting the ranch in first class condition was to guarantee top dollar at any subsequent sale. The expenses were incurred, however, on this Court's authority, and they have now inured to the benefit of Bruce Emery Griffin. If the Court had ordered only the minimum measures necessary to keep the horses alive and nothing else, the value of the property would have plummeted. Instead, the Griffins will reclaim an operational ranch that has retained most if not all of its initial value. Before they reclaim that property, however, they should be required to defray the expenses which have contributed to the preservation and maintenance of the ranch. This is the duty of the prevailing party, since it is the victor who receives the benefit. This result is dictated by the "general principles" and "elementary notions of justice" upon which rules of equity, like the one in *The Poznan,* are built.

### 4. Administrative Remedies

No procedure has been established to govern the payment of maintenance expenses when a claimant successfully asserts a defense to forfeiture before a sale takes place. When there is no claim filed until after a sale has already taken place, however, and the claimant then successfully asserts a defense, a regulation does exist to provide for the payment of expenses. *See* 19 C.F.R. § 162.51 (customs regulation); 21 U.S.C. § 881(d) (customs procedures apply to § 881 forfeitures). According to this regulation, if a claimant files an application for remission of the forfeiture and restoration of the property within three months after the sale, and the application is approved, the proceeds of the sale are given to the claimant. This is done,

however, only *after* taxes, marshal's fees, and other government expenses have been deducted. In short, when seized property is sold before a claim is filed, a successful claimant must pay all of the government's costs before receiving the balance of the proceeds of the sale.

It may be possible to distinguish this regulation as imposing a penalty for tardiness in the filing of a claim. This reads a purpose into the regulation that is not apparent from the language used, however. Furthermore, if there were equities favoring successful claimants with regard to the payment of maintenance expenses, it would seem that they would be at their strongest in cases where the property has not only been taken from them, but has been lost forever in a sale. If a successful claimant must pay the bills when his property has been sold by the government, certainly a successful claimant should also pay expenses when his property is returned in a similar, and in many aspects an improved, condition.

There are equitable and legal arguments on both sides of the costs issue in this case. The Court firmly believes that the balance of those arguments weighs heavily in favor of taxing the claimants for benefits they have received and costs they would have incurred.

### C. Practical Considerations

The total amount of the expenses incurred by the government from the date of this seizure through January 9, 1986 was itemized and introduced as an exhibit at a hearing held in Sherman, Texas on January 15, 1986. As reflected on that exhibit, the government had spent just over one and three-quarters of a million dollars for their entire operation involving the D.K.G. Ranch. The figures continue to increase on a daily basis.

The government has not asked this court to tax all of these costs against the claimants. They would omit court costs, litigation costs, and other costs that would not have been incurred by the Griffins if the seizure had never taken place. Because of this, nearly $425,000.00, labelled as "Seized Assets Management" and used primarily to pay for private security at the ranch, was excluded from the government's request. This was understandable after testimony at the hearing that the security at the D.K.G. was far more elaborate than at any of the neighboring ranches, and was in place partly because of veiled threats against the property allegedly made by parties close to the claimants. In addition, the government has credited nearly $50,000.00 in revenues against their expenses. These revenues were derived from boarding fees, auction fees paid by non-D.K.G. horse owners, land rentals, and show winnings. They do not include the money obtained for the sale of D.K.G. horses in the summer of 1985.

The government is seeking reimbursement for the remainder of their expenses, which total just under one and one third millions of dollars. These expenses include ranch operation and maintenance costs, equipment costs, and expenditures associated with the care and feeding of the horses located at the ranch. The ranch operation costs are broken down into categories such as labor, utilities, and pest control. Equipment costs include the price of gasoline, licenses, and insurance. Finally, the horse expenses include feed, veterinarian, training, and other similar costs. It is beyond doubt that the vast majority of these expenses would have been incurred regardless of who was operating the ranch.

Upon careful reflection, however, the Court is inclined to reduce or eliminate three of the itemized expenses in the categories just named. The exhibit reflects that the ranch's substitute custodian, Paul Aduddell, has been paid over one hundred thousand dollars for his services. While this may or may not be a reasonable salary for this position, it seems excessive under these circumstances. While the Griffins may have used a ranch foreman, it is likely that they would have performed many of the duties assumed by Mr. Aduddell. The Court believes that a one-half reduction in the amount of salary would be a more appropriate figure for taxation against the

claimants, since this would more accurately reflect the labor costs they would have incurred during the same time period, yet still recognizes the important service Mr. Aduddell provided.

The exhibit also reflects an expenditure of just over $43,000.00 for advertising. There is no doubt that the Griffins would have advertised their ranch and their studs. Many of these advertising expenses, however, purchased caps, match books, magazine advertisements, and other trinkets that touted the "U.S. Government D.K.G. Ranch." While this advertising may have indirectly benefitted the Griffins by keeping the D.K.G. Ranch in the public eye, it was certainly not intended to help them. It would be unfair to force them to pay for items that flaunt the government's possession of the D.K.G. Ranch.

Finally, the accounting shows an expenditure of nearly $40,000.00 for horse shows. Again, it is true that the Griffins would have attended shows in order to display the quality of their horses and attract attention to the D.K.G. Ranch. Many of these expenses, however, were for hotel rooms, and entertainment costs incurred by the ranch custodian, and not the Griffins. Any enhancement to the ranch's reputation earned by the government's participation in these shows weighs against the argument that the government should compensate for depreciation of the property, if any occurred. Forcing the Griffins to pay the custodian's bills at the shows goes too far, however.

When the last two items are deleted, and the first item is reduced, the final total is one million, one hundred fifty-one thousand, twenty-one dollars and twenty-eight cents ($1,151,021.28), which is approximately 65% of the total amount spent by the government on the D.K.G. Ranch. This amount will be taxed against the claimants. In addition, since these figures only account for the government's expenditures through January 9, 1986, the claimants will also be liable for the same proportion of expenses accruing after that date.

The average daily cost to operate the ranch is seventeen hundred and twenty-eight dollars and twenty-six cents ($1,728.26) when the "Seized Assets Management" costs are deleted along with the three other categories discussed by the Court. The claimants will also be taxed, therefore, at the rate of $1,728.26 a day from and including January 10, 1986 until the day the ranch is returned to the claimants.

The costs will be paid as follows. The sums currently in the registry of the Court which represent the proceeds of the sale of some D.K.G. horses in the summer of 1985 will be applied to claimants' liability for costs. This will reduce that liability by three hundred and thirty two thousand, eight hundred and forty-one dollars and fifty-nine cents ($332,841.59) plus the interest that has accumulated to date. The remainder of claimants' liability, which will be just over $800,000.00, will be attached as a lien against the D.K.G. Ranch, if not paid directly by claimants. If not paid in a timely manner, the property may be sold to satisfy this indebtedness.

## IV. LIFTING THE STAY

The claimants have filed two motions concerning the stay of judgment entered on December 23, 1985. The first is a Joint Motion to Release Household Furnishings. This motion is hereby GRANTED. Regardless of subsequent procedural steps, claimants should be allowed to remove these furnishings.

The claimants also filed a Motion to Reconsider Order Staying Enforcement of Judgment. Since the government's requests for relief from the judgment have now been denied, no reason remains to stay its enforcement. This motion will therefore be GRANTED.

An amended final judgment shall be entered accordingly to reflect the taxation of costs against the claimants and the elapse of time between entry of the original judgment and entry of the stay.

All of the above is so ORDERED.

## FINAL JUDGMENT ON CLAIM OF DR. LEFFIE M. CARLTON, JR.

On this day the severed action concerning the rights and liabilities of claimant Dr. Leffie M. Carlton, Jr. was considered. The Court has resolved this matter based on Dr. Carlton's Motion for Summary Judgment, with reasons included in a separate Memorandum Opinion and Order of this date. It is, therefore,

ORDERED, ADJUDGED and DECREED that claimant, Dr. Leffie M. Carlton, Jr., is not responsible for the bills sent by the plaintiff for the care, boarding or breeding of any horses owned by him which have been or are being boarded at the D.K.G. Ranch. Any such bills are hereby cancelled.

It is further ORDERED, ADJUDGED and DECREED that Dr. Carlton and the D.K.G. Ranch agreed to split the foals born to Dr. Carlton's mares. The actual division of those foals will be left to the original parties to the agreement.

All litigation costs associated with this severed action shall be borne by the parties incurring them.

## AMENDED FINAL JUDGMENT

On Monday, November 4, 1985, came on for trial before a jury the above-entitled and numbered causes of action. On Thursday, November 7, 1985, the jury returned its verdict in the form of answers to two special interrogatories.

It is now DECREED:

That based on the jury's answers to the special interrogatories, Bruce Emery Griffin and Donna Krauss Griffin are the owners of the real property and improvements that make up the D.K.G. Ranch, as well as the equipment, horses, bank accounts, and household furnishings on the D.K.G. Ranch at the time of its seizure.

That Bruce Emery Griffin and Donna Krauss Griffin, as owners, have standing to contest this forfeiture.

That the Honorable William M. Hoeveler, United States District Judge for the Southern District of Florida, has made it clear that Bruce Emery Griffin, in a pre-plea agreement with the government, listed certain of his properties that were to be forfeited to the government. This list implicitly prohibits the government from forfeiting other property owned by Bruce Emery Griffin that the government knew about at the time of the pre-plea agreement.

That Judge Hoeveler has enforced the pre-plea agreement and has found that the government knew about the D.K.G. Ranch and other related property listed above at the time of the pre-plea agreement.

That because of this agreement, and because of the jury's findings concerning ownership, Bruce Emery Griffin and Donna Krauss Griffin have a valid defense to this forfeiture action.

It is, therefore, ADJUDGED:

That Bruce Emery Griffin and Donna Krauss Griffin are entitled to reclaim the D.K.G. Ranch and other related property listed above.

It is, therefore, ORDERED:

That the plaintiff, the United States of America, return the D.K.G. Ranch and its related property as listed above to Bruce Emery Griffin and Donna Krauss Griffin or their duly appointed representatives.

That the parties meet as soon as possible with the ranch custodians to arrange a procedure to be followed to accomplish the return of the seized assets listed above. The return of the seized assets will be completed no later than fifty (50) days after the date of entry of this amended judgment.

That the claimants, Bruce Emery Griffin and Donna Krauss Griffin, shall be liable for the sum of one million, one hundred fifty-one thousand and twenty-one dollars and twenty-eight cents ($1,151,021.28), plus an additional one thousand, seven hundred and twenty-eight dollars and twenty-six cents per day from and including January 10, 1986 to the day the property is returned to the claimants. This sum shall be paid to the plaintiff, the United States of America, to reimburse it for a portion of the mainte-

nance expenses it incurred while the D.K.G. Ranch was in its possession pursuant to this Court's legal process.

That these expenses will be defrayed in part by applying the funds currently held in the registry of this Court to the debt. The balance may be paid by the claimants as they wish. If they fail to satisfy the debt upon terms acceptable to both parties, the balance will be recovered by execution upon the D.K.G. Ranch.